Good morning. Good morning. May it please the court, Jeffrey Feldman on behalf of the petitioners, Ellen, the Shillings, and the Shilling Livestock. I'd like to reserve three minutes for rebuttal if I could. I'd like to use this time to talk about the Supplemental Authority and the facts of this case. Those are fairly similar facts, similar cases. MOVE was a case where the appellant was also a claimant in a federal arbitration, and they moved the court under Section 10A.3, based on arbitrator misconduct. The court developed a framework there to determine whether or not arbitrator misconduct should cause an arbitration order to be vacated. Basically, there's a two-pronged test developed in that case. The first prong was, did the arbitrators commit misconduct that caused prejudice to a party, and then did that prejudice cause there not to be a fundamentally fair hearing for one of the parties? So what is the case that you're citing as your Supplemental Authority? It's MOVE v. Citigroup. MOVE. Right. It was... What's the citation? Did you give us a 28-J with that in it? I did, Your Honor. I can give it to you now, if you like. Okay. It's 840, half-second, 1152. So this rule just applies to the 10A3 argument we have for arbitrator misconduct. In MOVE, the arbitrator had deceived parties, asked for credentials, and basically asked who he was in violation of federal rules. The court found that the deception caused prejudice to the parties, and thereby caused there not to be a fundamentally fair hearing. The court did not find that the prejudice or the fundamentally unfair hearing caused the award. The court said, there's no way for us to determine if this fundamental unfairness caused the award. So the problems really are just two-fold, the two that I mentioned. In this case that we have at bar, we can show that fundamental unfairness caused the award, because of the language of the arbitrators at the hearing, and because of the language and the findings of the arbitration board. I'd like to read just one small portion of the MOVE case that deals directly with our case. It says, MOVE and Citigroup are going to arbitrate their multimillion-dollar dispute before a panel of three qualified arbitrators, as provided by FEMA's rules and regulations. Translates to such a proceeding were purchased by the inclusion of an arbitrator as chairperson who should not have been disqualified from arbitrating the dispute in the first place. So arbitration is based on contract. The agreement that the parties entered into by way of stipulation in a court case that they had was that the parties would arbitrate through FINRA and follow the rules of FINRA and sign uniform submission agreements, saying they would agree to FINRA rules. FINRA rule that isn't here, which is not followed, was the rule regarding answers. The FINRA rule, as I've briefed, says all relevant facts and defendances must be in a respondent's answer. Counsel, let me just ask you a question. Are there any cases finding arbitrator misconduct based on the arbitrator's rulings or decisions? Just simply on the conduct of the arbitrators in handling the arbitration and the decisions they make during the arbitration. On the left side of it, there was the point of misconduct was deception by the arbitrator about his credentials. But are there any cases where the arbitrator misconduct was simply based on how the arbitrators conduct the arbitration and maybe even in this world there's some evidentiary matters? I think that gets into the manifest disregard of the law argument, which is one of the bases for overcoming an arbitration war, and we have not alleged manifest disregard of the law here. I understand that. He's talking about arbitrator misconduct, so I'm going to try to understand. Are there any cases that have found arbitrator misconduct outside something extraordinary, like in the case you cited where the arbitrator misstated his credentials? Well, it seems that most of the cases from arbitrator misconduct relate to bias and what they've said or done as it relates to the case, whether it's taking ex parte evidence or just in general showing bias. I have not seen a case that deals with, in terms of arbitrator misconduct, where they are presented with a rule of the forum and they put the rule aside and they say we are going to accept, in this case, an affirmative defense without notice to the other side, which we would argue was very prejudicial to our clients for the many reasons we listed in our briefs and caused them to not have a fundamentally fair hearing. Counsel, if I could interject a question. I can understand the argument that accepting the defense might be procedurally incorrect or an incorrect ruling of law, but I'm having trouble understanding why it would become arbitrator misconduct assuming that it wasn't misstated. If you look at the Move decision, it talks about the arbitrator being deceitful on his qualifications and lying about who he was as being a violation of federal rules and regulations. That was the basis on which the Ninth Circuit found that there was a violation of Section 10A3. Okay, but in that case, the violation related to misconduct, are you saying that every violation of federal rules is per se a misconduct? No, I'm saying that if the arbitrator is aware of the rule, which we made him aware of the rule, that the defense had to be in their answer and it wasn't. We received no notice which counsel had agreed was the case at the hearing. We received no notice of this theory that Graham H. Blyle's networking exception, if you comply with all nine elements of it, then you're not a broker and you can't be held liable for brokerage. We never saw that until the words came out of Mr. Bly's mouth. So you're saying the first notice you had of the networking exception defense in your arbitration was when Bly testified? That was the very first notice you had? That was the very first notice and there's no evidence to the contrary that the appellees put in their brief that they construed as notice, but it doesn't say that. No, no, you said it has to have a heading notice of affirmative defenses. Is that, it has to be as explicit as that in your view because there was discussion of the act and the exception's liability. No, Your Honor, there was no discussion of the act. The act was, Graham H. Blyle was mentioned in documents in the arbitration. The agreement between the bank, Sterling, and the broker, Taylor Fintagra, was based on this exception to being a broker, to having to register as a broker. So that was very much referenced in the agreement between them and referenced in other things that talk about this networking exception. But the defense of not being a broker if you qualify for this exception and therefore you can't be liable as a broker, the first time as far as I know that that defense had ever been espoused or uttered, not just in our arbitration, but anywhere, was through Mr. Blyle's mouth. Well, what about the witness, Donald Wood? Didn't he take, didn't he walk the arbitrators through each of the networking exceptions, nine elements? He did. And we had no idea why they were asking him about these nine exceptions during the hearing. All we could do, at some point we started asking questions about, well, did they comply with this rule? When Jeffery Schenkel was asked about those nine elements, we said, well, what about this investment that Sterling is selling on its own? And there was an objection. Well, let me ask you this. When you've got a witness on the stand who takes the arbitrators through all nine elements and then explains how Sterling complied with each one, how did you not know that they were going to re-raise you this networking exception defense? I don't understand. First of all, I don't think there is a networking exception defense. I don't think, I think the Comptroller Courtesy made it very clear that the defense as stated by Mr. Blyle is erroneous, and it's not written anywhere, and you're looking at the statute. All it does, all the nine elements do, if you comply with them, is prevent the bank from having to register as a broker-appealer. That's all it does. There's nowhere where it says it excludes liability for acting as a broker. That's why I listed all the other exceptions under Gramm-Leach-Blyle. If they sell private securities, they don't have to register as a broker. Are they not liable then if they do something wrong? If they have a diminished number of trade-offs. It's the arbitrator to decide, not us. I'm sorry, what's for the arbitrator to decide? Whether or not who prevails. Who prevails and whether or not there was a violent offense. Weren't the attorneys for the Shermans given an opportunity to file substantial briefs on this issue? Well, at the end of the hearing, the arbitrator, the chair, did say it doesn't seem like counsel is enthusiastic about briefing this. And counsel, which is me, replied, that's correct. Now, that followed a discussion about all the ways in which we were prejudiced by not having this defense. But that was the perfect opportunity to educate the arbitrators as to why the arbitrators should not consider the defense. Now, you were on notice that you could counter that defense. Well, it didn't allow us to go back and do discovery. It didn't allow us to cross-examine witnesses. It didn't allow us to prepare for the cross-examination of Mr. Bly. It didn't allow us to bring in witnesses that we had previously identified who could have countered this defense. As a matter of fact, we hadn't taken off a brief on any of that. Yes, we had briefs. We sure did. Post-arbitration? No, in our briefs to this court. We talked about how this was. You had the opportunity to supplement a briefing to the arbitrators. And it appears to me that it would have been prudent to at least make an offer of proof to the arbitrators as to what evidence or information could have been garnered that would support your position. No, that wouldn't have cured the prejudice. Briefing alone would have done nothing to us. First of all, at that time, we had no idea if this was a legitimate defense or not. So we didn't know if we would need to have these other witnesses, if we would need to cross-examine on these other points. We had no idea because we had no notice of the defense, zero notice of the defense. So it was impossible for us to know if the briefing alone would be satisfactory. I see that my time is done. All right. We see the remainder of your time. Thank you. May it please the Court, Counsel, Bruce Campbell on behalf of the respondents, Appellee, Umpqua Bank. As the Court is aware, there is a very high standard for setting aside arbitration awards. And in this case, the appellants, they still have not come close to meeting that standard, both as a factual and legal basis. There are three bases upon which they try to set aside the award. Number one, the expert for Sterling Bank, which is now Umpqua Bank, John Bly, the panel allowed him to testify to the law, what the law is. And on that point, I think it merits very little discussion because the Shillings called an expert during their case in chief, Paul Meyer, who testified exactly what the law is. And Mr. Meyer testified. Mr. Meyer was a suitability or offered as a suitability expert. He was a workforce securities firm for years and years. Despite that limited knowledge, he testified that a bank, like Sterling Bank, enters into a networking agreement with a FINRA broker-dealer, somehow steps in the shoes of the FINRA broker-dealer and owes the duties, duties of supervision, duties of due diligence, duties of compliance, all of the duties that a broker-dealer would owe under FINRA. Did Sterling give written notice of the networking exemption as a defense? Yes, Your Honor. Here's what Sterling did is after the networking exemption, an interview is not a defense. When you try to hold a bank liable as a broker-dealer, that is an obstacle that the claimant here needs to surmount. If they're going to take that extraordinary step, the legal was mentioned in the Investment Services Agreement. It was mentioned in the interagency statement. Both of which were put into evidence during the first week of hearing in January. But after Mr. Meyer justified that Sterling, as a bank, owes the duties of a broker-dealer, just as if they were a NASD at the time or now a FINRA member, then we said, wait a minute. We're going to call a banking expert to actually contradict that testimony. Let me see if I understand. You're saying you weren't obligated to give notice of the defense, and the first time you decided to raise that defense was after they presented their case? Your Honor, that is when it became apparent to Sterling that they were not holding Sterling liable for something that Sterling did independently, but they were holding Sterling liable as if it were a broker-dealer. And that's when the issue was plogging. And so what we did is we said we gave notice in February of 2014. When the hearing resumed, we intended to call John Glei as an expert, but it was an objection. And then we submitted a proceeding to the court or to the arbitrator, and we said Mr. Glei will testify that contrary to Mr. Myers' testimony, a commercial or community bank like Sterling that enters into a third-party agreement with a FINRA broker-dealer to enable the sale of non-deposit investment products to its customers does not take on the obligations of a FINRA broker-dealer. That is the lead line. That's exactly what the networking exception states. It was a key to stay. And then if it hadn't been claimed by that point, because it was contained throughout the Investment Services Agreement, before the hearing we provided, we marked it as Exhibit 535, a copy of GLEIBA, and we provided it to counsel. At the same time, counsel provided us with a copy of the FDIC Compliance Manual. This is before the resumption of the hearing in May. And that FDIC Compliance Manual, which is also in evidence, the force record, goes on at length. We talk about the GLEIBA networking exception and the nine requirements must be met. So it was abundantly clear that that's something we were going to be relying upon when the hearing resumed. And as Your Honor noted, Mr. Wood, on the first day of the hearing, me and Mr. Slinker were both shown Exhibit 535, GLEIBA, walked through the nine exemptions, the networking exemptions, or the nine factors for application of GLEIBA. And so there was no bomb was dropped on the last day of the hearing when Mr. GLEI testified. That statement is simply incorrect. The shillings did not know or should not have known of the GLEIBA bar to their claim. If I had counsel's judgment, if I could interject. Sal, help me out on the theory here from your client's point of view. Is the third-party networking exception and affirmative defense that your client's claim or I'm going to now was required to plead as a matter of their asserting affirmative defenses? Or is it a matter that the plaintiff has to show the absence of those elements as part of its ameficia case to hold sterling as a conduct that was like brokered conduct? Your Honor, it is the latter. And I think the district court got it correct when it said it's part of their when they want to take the extraordinary step of holding not only Integra in this case, who is a broker-dealer, liable as a broker-dealer, but they want to pass that liability through in kind of a derivative capacity, if you will, to sterling, then that's an extra step. And that's part of their affirmative obligation to show why is it that you can hold this other debate liable as a broker-dealer? It's just as if you were asserting a claim for, let's say, increasing the corporate bail or for derivative or secondary liability. It's not an affirmative defense from the party who is derivatively or secondarily liable to say, wait a minute, you can't hold us liable without showing that there's a basis for our liability. And so it is part of their obligation. I would submit, though, even if it would be properly characterized as an affirmative defense, this is arbitration, it's FINRA arbitration, it's not anywhere close to the MOVE case. MOVE, I think, if anything, highlights the deficiencies in the argument that we have here today or the basis for trying to set aside the FINRA award. Jay, thank you. Because in the MOVE case, he had, that's the technical violation of FINRA rules, but he had an arbitrator who was an imposter. He said, he purported, and this was the chairperson of the panel, purported to be a lawyer when, in fact, he was not. So it went to the underlying integrity of the proceedings. And I think this court rightfully held that that would amount to arbitrator misconduct under the very narrow standards. And even the court remarked that that was a very unusual case. But not every violation of FINRA rules, even if there were a violation, would amount to a basis for vacating arbitration awards. I think even if we were in a case where we had, the court were reviewing what the panel did as a district court, it would still be within a district court's discretion to treat this, to say, can you claim that you had fair notice of the, leave a seal, whatever you want to call it, an affirmative defense seal or a bar of liability. And they proceeded with that knowledge. So there was no inherent unfairness. There was no, they weren't fundamentally deprived of a fair hearing by the way this case unfolded. I think to address Judge Rollins' question, is at the end of the hearing, the panel did, the chairperson of the panel did give Sully an opportunity to do further briefing. If Sully didn't know what the law was, if counsel didn't know what the law was, that's the next opportunity to learn it very quickly and submit a brief and try to argue why it was that they should be afforded more briefing or maybe even an additional day of hearing. But instead, they said, nope, we'll just take our chances. It creates the opportunity for a sandbagging because if they get a favorable decision from the panel, then they're fine. If they get an unfavorable decision from the panel, then they say, wait a minute, we were deprived of a fair hearing because of this leave issue. So we get to vacate the award. They had every opportunity. They knew about the leave. It was in the case for a long time. And they were given an opportunity to submit additional briefing on that issue. And I think that was, they had ample and fair protections. The final argument that the plaintiffs have offered here is that Mr. Blyde testified falsely. I think, again, that doesn't merit much discussion. As the district court concluded, Mr. Blyde's comments about a treatise by Melanie Fine was made in reference to a question that was somewhat ambiguous because the question was whether the circumstances present here and that it was capable. If you look at the colloquy, this is in our brief that existed right before that question was asked, Mr. Feldman tried to put Mr. Blyde in sort of a box and tried to make him take an absolute position. Mr. Blyde kept pushing back and saying, look, all I'm saying is it's not an absolute bar to liability, but when you're trying to hold a plea liable as if it were a broker-dealer, it does not permit liability provided that those nine factors are met. So the final point there is Mr. Blyde's testimony spanned 140 pages of transcript. He went to great lengths in explaining the basis of his opinion. The comment that he made about Mrs. Fine was just the testimony panel didn't say anything about it in its award. In fact, they didn't even mention Mr. Blyde. They talked only about the legal itself, the FDIC compliance manual, the interagency statement, and the industrial services agreement. All the votes mentioned leave a networking exception. So unless the court has any questions, I would ask the court to affirm the district court decision and uphold the arbitration award in favor of Sterling Mihoho Probate. Any questions, Judge Gould? No questions here. Thank you. Thank you very much. If there's no questions, rebuttal. Nice try. Many of the issues that have come up here today are addressed in our briefing. Schlenker, for instance, when we asked him a question about whether or not the bank's name was on an investment, there was an objection, relevance. Well, at the time, I didn't know that they were going to be presenting a defense based on these nine elements. Well, one of the nine elements directly relates to whether or not the bank put its name on investments. Well, I couldn't argue that because I had no idea they were going to have the defense. That's true with much of the evidence that was in the hearing. So, again, the briefing wouldn't have inferred that. Mr. Meyer's testimony. Mr. Meyer specifically said he's not qualified to give a legal opinion, and he never did so. That's in the ER 1341. What he was doing was reading the plain language of the documents, like the internal policy manual for the bank, and would say if they had to decide if investments were suitable, if they had to supervise people, if they had to train them, and ask them based on the documents you've reviewed, have they done this? And he said no. He was just reading the plain language. They then brought in somebody to give a legal opinion, which was inappropriate. Thank you. Thank you. Thank you to both counsel for your argument in this case. This argument is submitted for decision by the court. The final case on calendar, Brandon Fells v. Tycor, calendar insurance has been submitted on a brief that completes our calendar for the day and for this week. We stand adjourned.
judges: Gould, Rawlinson, Rayes